## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CINDY CELESTE CAMPBELL,

                              Plaintiff,

vs.

EQUIFAX INFORMATION
SERVICES LLC, EXPERIAN
INFORMATION SOLUTIONS, INC.,
TRANS UNION, LLC, and
LEXISNEXIS RISK SOLUTIONS,

                          Defendants.

CASE NO.:

**JURY TRIAL
DEMANDED**

## COMPLAINT

Cindy Celeste Campbell ("Plaintiff") brings this Complaint against Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), and LexisNexis Risk Solutions ("LexisNexis")   (collectively "Defendants") for actual, statutory, and punitive damages, costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, arising out of the credit bureau defendants'

1

mixing of Plaintiff's credit files with another consumer's credit file, despite the fact that the other consumer has an entirely different name, date of birth, and Social Security number than Plaintiff.

## PRELIMINARY STATEMENT

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual citizens. Data technology, whether it be used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individuals to flow immediately to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should benefit from the resulting convenience and efficiency.

2.      Unfortunately, however, this information has also become readily available for and subject to mishandling and misuse. Individuals can sustain substantial damage, both emotionally and economically, whenever inaccurate information or fraudulent information is disseminated about them.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, automobile dealers, potential employers, and other similar interested parties) information commonly called "consumer reports," concerning individuals who may be applying for retail credit, to lease an apartment, to obtain a mortgage, auto loan, employment, or the like.

5.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

6.     Congress made the following findings when it enacted the FCRA in 1970:

1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

3) Consumer reporting agencies have assumed a vital role in assembling and evaluation consumer credit and other information on consumers.

4) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4). Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities'". *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

7.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et seq.* ("FCRA"), federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

8.     "Mixed files" create a false description and representation of a consumer's credit history.

9.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

4

10.    The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

11.    Mixed files are not a new phenomenon. Equifax, Experian, Trans Union, and LexisNexis have been on notice of the existence of mixed files, and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

12.    More recently, Equifax, Experian, Trans Union, and LexisNexis have been the subject of numerous state attorney general actions relating to its mixed file problem.

13.    For example, in 2015, the New York Attorney General filed charges and settled claims with Equifax, Experian, and Trans Union over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v.*

---

[1] https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited January 24, 2021; *see also* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited January 24, 2021.

*Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

14.   Notwithstanding Equifax, Experian, Trans Union, and LexisNexis' notice and being subject to repeated enforcement actions, mixed files continue to occur dispute consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

15.   Further, mixed files result in the disclosure of a consumers' most personal identifying and financial information absent the consumer's knowledge or consent, or both.

16.   Equifax, Experian, Trans Union, and LexisNexis have each been sued thousands of times wherein an allegation was made that Equifax, Experian, Trans Union, and LexisNexis violated the FCRA. Moreover, Equifax, Experian, Trans Union, and LexisNexis are sued, at a minimum, hundreds of times each year wherein an allegation is made that they mixed a consumer's credit file with that of another person.

17.   Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

18.   For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated

the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them dispute Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

19.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, the credit bureaus continue to mix consumers' credit files with other consumers' credit files.

20.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' numerous disputes. Despite the verdict, the credit bureaus continue to mix consumers' credit files with other consumers' credit files.

21.     Most recently, a jury assessed a $60 million verdict against Trans Union for mixing innocent American citizens with terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC,* No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020). Despite the verdict, the credit bureaus continue to mix consumers' credit files with other consumers' credit files.

22.     "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

23.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

24.    Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including Equifax, Experian, and Trans Union, to review their procedures when a mixed file case occurs.

25.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

## THE PARTIES

26.    Plaintiff Cindy Celeste Campbell ("Plaintiff") is a natural person who resides in the State of Maryland, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

27.    Defendant Equifax Information Services, LLC ("Equifax") is a limited liability company and resides in the State of Georgia, including in this District.

28.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

29.     Defendant Experian Information Solutions, Inc. ("Experian") is a limited liability company that is authorized to do business in the State of Georgia, including in this District.

30.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

31.     Defendant Trans Union, LLC ("Trans Union") is a limited liability company that is authorized to do business in the State of Georgia, including in this District.

32.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

33.     Defendant LexisNexis Risk Solutions ("LexisNexis") is a limited liability company and resides in the State of Georgia, including in this District.

34.     LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating,

and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

37.     Plaintiff mailed multiple written disputes regarding inaccurate information in her LexisNexis credit report to LexisNexis located in Fulton County; Atlanta, Georgia.

38.     Defendant LexisNexis received Plaintiff's multiple written disputes in Fulton County; Atlanta, Georgia.

39.     Upon receipt of Plaintiff's disputes, Defendant LexisNexis forwarded such disputes to furnishers via Automated Consumer Dispute Verification electronic forms. Upon completion of its investigations pursuant to 15 U.S.C. § 1681s-2(b), the furnishers responded to Defendant LexisNexis' electronic communications, which

originated from Atlanta, Georgia, by sending its results electronically to Defendant

LexisNexis in Fulton County; Atlanta, Georgia

40.    Defendant LexisNexis then processed the dispute results at its National

Consumer Assistance Center in Atlanta, Georgia, and mailed Plaintiff its final

dispute results from Atlanta, Georgia.

## **FACTS**

### **Summary of the Fair Credit Reporting Act**

41.    The FCRA governs the conduct of consumer reporting agencies in an

effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit

information.

42.    The purpose of the FCRA is to require consumer reporting agencies to

"adopt reasonable procedures for meeting the needs of commerce for consumer

credit, personal, insurance, and other information in a manner which is fair and

equitable to the consumer, with regard to the confidentiality, accuracy, relevancy,

and proper utilization of such information…." 15 U.S.C. § 1681(b).

43.    The FCRA further requires that when preparing consumer reports a

consumer reporting agency must follow "reasonable procedures to assure maximum

possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

## The Credit Bureau's Processing of Credit Information

44.    Defendants Equifax, Experian, Trans Union, and LexisNexis regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

45.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

46.    Defendants collect information from thousands of furnishers.

47.    The process by which Defendants receive, sort, and store information is largely electronic.

48.    Furnishers report credit information to Defendants through the use of coded tapes that are transmitted on a monthly basis through software known as Metro 2.

49.    Defendants take the credit information reported by furnishers and create consumer credit files.

50.    Defendants maintain credit files on more than 200 million consumers.

51.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Equifax, Experian, Trans Union, and LexisNexis' Mixed File Problem**

52.    Defendants know that different consumers can have similar names.

53.    Defendants know that different consumers can have similar Social Security numbers.

54.    Defendants know that different consumers with similar names can also have similar Social Security numbers.

55.    Defendants know that public records often do not contain identifying information such as Social Security numbers or dates of birth.

56.    Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

57.    Defendants accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

58.    Sometimes Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer, resulting in what is commonly known in the industry as a mixed or merged credit file.

59.    Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the three major CRAs, Equifax, Experian, and Trans Union, regarding their significant failures and deficiencies with respect to mixed files.

60.    Despite Defendants' long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendants containing information belonging to another consumer.

61.    A mixed or merged credit file is the result of Defendants inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

62.    There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Defendants to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

63.    The success or failure of these algorithms and rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendants.

64.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendants.

65.    These rules also determine which credit files are selected by the algorithm and merged to create a complete consumer report.

66.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

**Defendants' Practices Concerning the Sale of Credit Reports on the "Deceased"**

67.    Defendants Equifax, Experian, Trans Union, and LexisNexis sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

68.    Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendants Equifax, Experian, Trans Union, and LexisNexis, are required "to follow

reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

69. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendants Equifax, Experian, Trans Union, and LexisNexis, must maintain reasonable procedures to assure that reports are sold only for legitimate "permissible purposes."

70. Defendants Equifax, Experian, Trans Union, and LexisNexis routinely place a "deceased" notation or marking on credit reports when they are advised by any of their many data furnishing sources (such as banks and debt collectors) that a given consumer is deceased.

71. Defendants Equifax, Experian, Trans Union, and LexisNexis' furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

72. Defendants Equifax, Experian, Trans Union, and LexisNexis do not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

73.     Defendants Equifax, Experian, Trans Union, and LexisNexis do not request or require any proof from any data source which advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

74.     Defendants Equifax, Experian, Trans Union, and LexisNexis do not independently verify with any source or furnisher that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

75.     In some cases, in order to assure accuracy, Defendants Equifax, Experian, Trans Union, and LexisNexis may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendants Equifax, Experian, Trans Union, and LexisNexis do not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" deceased code is furnished to it to be placed in said consumer's credit file or report.

76.     Defendants Equifax, Experian, Trans Union, and LexisNexis regularly receive the "Death Master File" from the Social Security Administration, including

weekly and/or monthly updates, listing by social security number those consumers that the government believes to be deceased. But Defendants Equifax, Experian, Trans Union, and LexisNexis do not cross-reference the "X" code received from data furnishers with the Death Master File in order to determine whether any given consumer reported as deceased via a furnishing source is also on the Death Master File before selling a credit report about said consumer, or at any time.

77.     Defendants Equifax, Experian, Trans Union, and LexisNexis will only use the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

78.     Defendants Equifax, Experian, Trans Union, and LexisNexis do not employ any procedures *at all* to assure that a consumer with a "deceased" mark on a report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

79.     Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendants Equifax, Experian, Trans Union, and LexisNexis do not employ any procedures to assure that a consumer with a "deceased" mark on a report is, in fact, actually deceased before placing the "deceased" mark in that consumer's file.

80.    Even   in   instances   where   the   purportedly   deceased   consumer communicates   directly   with   Defendants   Equifax,   Experian,   Trans   Union,   and LexisNexis, Defendants Equifax, Experian, Trans Union, and LexisNexis do not employ any procedures to assure that a consumer with a "deceased" mark on a report is, in fact, actually deceased before placing the "deceased" mark on that consumer's report.

81.    Once   a   "deceased"   mark   is   placed   upon   a   consumer's   report, Defendants Equifax, Experian, Trans Union, and LexisNexis will not calculate and will not provide a credit score for that consumer.

82.    Upon Defendants Equifax, Experian, Trans Union, and LexisNexis' reports with a "deceased" mark sold to third parties, Defendants Equifax, Experian, Trans Union, and LexisNexis never calculate or provide a credit score for that consumer and instead reports that consumer's credit score as "N/A."

83.    Defendants Equifax, Experian, Trans Union, and LexisNexis know that third-party credit issuers require a credit score in order to process a given credit application.

84.    Defendants Equifax, Experian, Trans Union, and LexisNexis know that consumers without credit scores are unable to secure any credit from most credit issuers.

85.    Defendants Equifax, Experian, Trans Union, and LexisNexis know that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

86.    Defendants Equifax, Experian, Trans Union, and LexisNexis have been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

87.    Defendants Equifax, Experian, Trans Union, and LexisNexis have received and documented many disputes from consumers complaining that their credit reports had them erroneously marked as "deceased."

88.    Defendants Equifax, Experian, Trans Union, and LexisNexis know that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" code, even when said consumers (and their dates of birth and social security numbers) are not on the Death Master File and are, in fact, alive.

89.    Nevertheless, Defendants Equifax, Experian, Trans Union, and LexisNexis do not employ any procedures to assure that a consumer marked as "deceased" on their credit reports is, in fact, deceased.

90.    Even consumers who dispute the erroneous "deceased" status on their Equifax, Experian, Trans Union, and LexisNexis credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

91.    Defendants Equifax, Experian, Trans Union, and LexisNexis do not have any independent procedure to change an erroneous deceased status on their own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

92.    Nor do Defendants Equifax, Experian, Trans Union, and LexisNexis employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

93.    For years after a consumer's actual death, Defendants Equifax, Experian, Trans Union, and LexisNexis will continue to sell credit reports about that consumer.

94.    Defendants Equifax, Experian, Trans Union, and LexisNexis will only remove a deceased consumer's file from their respective credit reporting databases when it is no longer valuable to them—meaning that no one is continuing to purchase reports about that consumer.

95.     Defendants Equifax, Experian, Trans Union, and LexisNexis charge third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

96.     Defendants Equifax, Experian, Trans Union, and LexisNexis profit from the sale of reports on deceased consumers.

97.     Defendants Equifax, Experian, Trans Union, and LexisNexis have in their respective credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that they have marked as "deceased."

98.     Defendants Equifax, Experian, Trans Union, and LexisNexis know that truly deceased consumers do not apply for credit.

99.     Defendants Equifax, Experian, Trans Union, and LexisNexis know that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendants Equifax, Experian, Trans Union, and LexisNexis to be a common and major source of identity theft.

100.    Defendants Equifax, Experian, Trans Union, and LexisNexis know that identity theft and credit fraud are serious and widespread problems in our society.

101.   Defendants Equifax, Experian, Trans Union, and LexisNexis warn the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

102.   Defendants Equifax, Experian, Trans Union, and LexisNexis have no similar death certificate, executorship paper, or any other proof requirements for their data sources, which report a consumer as deceased or for the purchasers of their reports who access the purportedly deceased consumer's information.

103.   Defendants Equifax, Experian, Trans Union, and LexisNexis sell reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

104.   For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendants Equifax, Experian, Trans Union, and LexisNexis n to sell their credit reports, absent a court order.

105.   Defendants Equifax, Experian, Trans Union, and LexisNexis know that such reports contain a vast amount of personal identifying and credit account

information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

## The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

106.   The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

107.   Consumer reporting agencies Equifax, Experian, Trans Union, and Innovis have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

108.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

109.   Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately

appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

110.   Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

111.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between the data furnishers and the credit reporting agencies.

112.   These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

113.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

114.   The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

115.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**Equifax Reporting Plaintiff as Deceased on or about April 12, 2022**

116.   Upon information and belief, on or about April 12, 2022, Equifax was reporting Plaintiff as deceased in Plaintiff's credit report.

**Experian Reporting Plaintiff as Deceased on or about April 12, 2022**

117.   Upon information and belief, on or about April 12, 2022, Experian was reporting Plaintiff as deceased in Plaintiff's credit report.

**Trans Union Reporting Plaintiff as Deceased on or about April 12, 2022**

118.   Upon information and belief, on or about April 12, 2022, Trans Union was reporting Plaintiff as deceased in Plaintiff's credit report.

**Santander Consumer USA / King Lincoln Inc. Denies Plaintiff's Credit April 12, 2022**

119.   On or about April 12, 2022, Plaintiff sought to obtain an auto loan and submitted a credit application.

120.   Upon submitting a credit application, Santander Consumer USA / King Lincoln Inc. denied Plaintiff's credit application.

121.   Santander Consumer USA / King Lincoln Inc. relied on the contents of Plaintiff's credit files at the time they denied Plaintiff's credit application. As of April 12, 2022, the date Santander Consumer USA / King Lincoln Inc. accessed Plaintiff's credit file, it was mixed with another consumer's personal and credit account information.

122.   The credit bureaus' inaccurate credit reporting adversely impacted Plaintiff's credit score and caused Santander Consumer USA / King Lincoln Mercury Inc. to deny Plaintiff's credit application.

**Defendant Experian Fails to Provide Credit Disclosure**

123.   On or about April 15, 2022, Plaintiff requested a credit disclosure from Defendant.

124.   Defendant Experian failed to provide the requested credit disclosure in violation of 15 U.S.C. § 1681g.

**Plaintiff's April 18, 2022 Dispute with Equifax**

125.   On or about April 18, 2022, extremely shocked, surprised, and embarrassed at Defendant's inaccurate reporting, Plaintiff mailed a written dispute to Equifax, via certified mail, disputing the deceased notation that the credit bureau was reporting in Plaintiff's credit reports. Plaintiff requested they reinvestigate the disputed information, correct the reporting, and send corrected copies of the credit reports.

126.   Plaintiff's April 18, 2022 dispute specifically included Plaintiff's full name, date of birth, Social Security number, and current address, so that the credit bureaus would be able to properly identify Plaintiff and locate Plaintiff's credit file.

## Equifax's Response to Plaintiff's April 18, 2022 Dispute

127.   Defendant Equifax did not respond to Plaintiff's dispute.

128.   Defendant Equifax did not indicate that Plaintiff's dispute was found to be frivolous or irrelevant.

129.   Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

130.   Defendant failed to provide the requested credit disclosure in violation of 15 U.S.C. § 1681g.

**Defendant LexisNexis Fails to Provide Credit Disclosure August 1, 2022**

131.   On or about August 1, 2022, Plaintiff requested a credit disclosure from Defendant.

132.   Defendant failed to provide the requested credit disclosure in violation of 15 U.S.C. § 1681g.

**Defendant Experian Fails to Provide Credit Disclosure August 1, 2022**

133.   On or about August 1, 2022, Plaintiff requested a credit disclosure from Defendant.

134.   Defendant Experian failed to provide the requested credit disclosure in violation of 15 U.S.C. § 1681g.

**Plaintiff Sees Inaccurate Information on her LexisNexis Credit Report on or about October 12, 2022**

135.   Upon information and belief, as of October 12, 2022, Plaintiff's LexisNexis credit report contained the following names which belong to another consumer:

> Chrissy Cecile Campbell
> Crissy Campbell
> Chrissy Cambell
> Chris Campbell

136.   Upon information and belief, Plaintiff's LexisNexis credit report contained the following, which belongs to another consumer:

Date of Death 3/20/2019

137.   Upon information and belief, Plaintiff's LexisNexis credit report contained a social security number which belongs to another consumer.

138.   Upon information and belief, Plaintiff's LexisNexis credit report contained multiple addresses which belong to another consumer.

139.   Upon information and belief, Plaintiff's LexisNexis credit report contained a driver services records which belongs to another consumer.

140.   Defendant mixed another consumer's personal and account information into Plaintiff's credit reports despite the fact that numerous discrepancies exist between their personal identification information. The discrepancies that should have caused Defendant to realize Plaintiff is not the same person as this other consumer include the following:

a)  Plaintiff's legal name is Cindy Celeste Campbell and the personal and account information Defendant mixed into Plaintiff's credit reports belong to another consumer, her deceased sister Chrissy Campbell; and

31

b) Plaintiff's Social Security number is different than the other consumer's Social Security number.

### Plaintiff's October 24, 2022 Dispute with LexisNexis

141.   On or about October 24, 2022, Plaintiff filed a written dispute regarding the inaccurate information that does not belong to Plaintiff with Defendant.

142.   Plaintiff's dispute specifically included Plaintiff's full name, date of birth, Social Security number, and current address, so that the credit bureaus would be able to properly identify Plaintiff and locate Plaintiff's credit file.

### The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

143.   The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

144.   Consumer reporting agencies have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

145.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry-wide as the CDIA's "Credit Reporting Resource Guide."

146.   Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

147.   Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

148.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

149.   These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

150.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

151. The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

152. Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**LexisNexis's Response to Plaintiff's October 24, 2022 Dispute**

153. Defendant LexisNexis did not respond to Plaintiff's October 24, 2022 dispute.

154. Defendant did not indicate that Plaintiff's dispute was found to be frivolous or irrelevant.

155. Defendant failed to conduct a reinvestigation of Plaintiff's dispute, in violation of 15 U.S.C. § 1681i.

156. Thereafter, LexisNexis continued to report personal and credit account information belonging to another consumer in Plaintiff's credit file.

157.   Defendant failed to provide the requested credit disclosure in violation of 15 U.S.C. § 1681g.

**Plaintiff Sees Inaccurate Information on her LexisNexis Credit Report on or about November 18, 2022**

158.   Upon information and belief, as of November 18, 2022, Plaintiff's LexisNexis credit report contained the following names, which belong to another consumer:

> Chrissy Cecile Campbell
> Crissy Campbell
> Chrissy Cambell
> Chris Campbell

159.   Upon information and belief, Plaintiff's LexisNexis credit report contained the following, which belongs to another consumer:

> Date of Death 3/20/2019

160.   Upon information and belief, Plaintiff's LexisNexis credit report contained a social security number which belongs to another consumer.

161.   Upon information and belief, Plaintiff's LexisNexis credit report contained multiple addresses which belong to another consumer.

162.   Defendant mixed another consumer's personal and account information into Plaintiff's credit reports despite the fact that numerous discrepancies exist between their personal identification information.

### Plaintiff's December 15, 2022 Dispute with LexisNexis

163.   On or about December 15, 2022, Plaintiff filed a written dispute regarding the inaccurate information that does not belong to Plaintiff with Defendant.

164.   Plaintiff's dispute specifically included Plaintiff's full name, date of birth, Social Security number, and current address, so that the credit bureaus would be able to properly identify Plaintiff and locate Plaintiff's credit file.

### LexisNexis's Response to Plaintiff's December 15, 2022 Dispute

165.   Defendant LexisNexis did not respond to Plaintiff's December 2022 dispute.

166.   Defendant did not indicate that Plaintiff's dispute was found to be frivolous or irrelevant.

167.   Defendant failed to conduct a reinvestigation of Plaintiff's dispute, in violation of 15 U.S.C. § 1681i.

168.    Thereafter, LexisNexis continued to report personal and credit account information belonging to another consumer in Plaintiff's credit file.

169.    Defendants maintain/maintained multiple credit files for Plaintiff.

170.    At least one of Plaintiff's credit files contain or have contained personal information and credit account information, including a deceased notation, which do not belong or pertain to Plaintiff.

171.    Defendants' merging and matching algorithms have caused Plaintiff's credit files to become mixed with personal and credit account information belonging to a different consumer.

172.    Within the two (2) years previous to the filing of this Complaint, Defendants prepared and distributed one or more consumer reports, as that term is defined by 15 U.S.C. § 1681a(d), pertaining to Plaintiff that contained misleading and inaccurate information which belongs to another consumer, including without limitation, personal information and credit accounts, which actually belong to a different consumer.

173.    Defendants failed to maintain and follow reasonable procedures to assure the maximum possible accuracy of the personal and credit account information contained within at least one of the credit files they maintain for Plaintiff.

174.   Defendants know that its matching algorithms are flawed and frequently result in mixed information and credit files belonging to two different consumers.

175.   Defendants have been sued thousands of times by consumers and suffered judgments as a result of mixing consumer credit information and credit files.

176.   When Defendants assemble consumer reports for their subscribers, they allow such subscribers to use only a partial list of personal identifiers to match data to the target consumer resulting in the inclusion of a broad range of credit information; information which may in some cases, like the instant matter, belong to another consumer.

177.   Defendants also fail to require an exact match of all digits of a consumer's Social Security number, which may in some cases result in the inclusion of credit information which belongs to another consumer.

178.   However, when consumers like Plaintiff request copies of their credit files, Defendants require a complete match of all personal identifiers, resulting in a narrower match of data for the consumer.

179.   Consequently, Defendants' own procedures for disclosing information to consumers, as they are required to do by the FCRA, tend to mask or conceal the problem of mixed files.

180.   By concealing this information, Defendants impair the ability of consumers, like Plaintiff, to identify and dispute errors resulting from mixed credit information or credit files.

181.   Defendants have failed to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit files and of Plaintiff's consumer reports, in violation of 15 U.S.C. § 1681e(b).

182.   Defendants' failures to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit files and of Plaintiff's consumer reports was negligent and/or willful.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim For Relief Against Defendants)

183.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-182 as if fully stated herein.

184.   Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit file they published and maintain concerning Plaintiff.

185.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her credit; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumers' personal and credit account information mixed in her credit file.

186.   Defendants' conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

187.   Plaintiff is entitled to recover attorney's fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i

**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim For Relief Against Defendants Equifax, Experian, and**
**Trans Union)**

188.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-182 as if fully stated herein.

189.   Defendants violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit file after it received multiple notices of such inaccuracies; by failing to conduct a lawful reinvestigation on numerous occasions of both disputed credit accounts and hard inquiries; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files.

190.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her credit; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumers' personal and credit account information mixed in her credit file.

191.   Defendants' conduct, action, and inaction were willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

192. Plaintiff is entitled to recover attorney's fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681g**
**Failure to Provide Disclosures to Plaintiff**

193. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-182 as if fully stated herein.

194. Defendants violated 15 U.S.C. § 1681g by failing to provide Plaintiff's credit disclosure after each request.

195. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from Plaintiff's credit; detriment to Plaintiff's credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment.

196. Defendants' conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

197.   Plaintiff is entitled to recover attorney's fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)   Determining that each Defendant negligently and/or willfully violated the FCRA; and

b)   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

198.   Plaintiff demands a trial by jury.

Dated:      3/15/2024               JOSEPH P. MCCLELLAND, LLC


                                    */s/ Joseph P. McClelland*
                                    Joseph P. McClelland
                                    LAW FIRM OF JOSEPH P.
                                    MCCLELLAND, LLC
                                    Georgia Bar No: 483407
                                    235 East Ponce de Leon Avenue, Suite 215

Decatur, GA 30030
Telephone: (770) 775-0938
Fax: (470) 468-0070
Email: joseph@jacksonlaws.com


*ATTORNEY FOR PLAINTIFF*